# 0UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

POLLY A. KUNSELMAN,

                Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,[1]

              Defendant.

CIVIL ACTION NO. 3:16-CV-00747

(MARIANI, J.)
(MEHALCHICK, M.J.)

## REPORT AND RECOMMENDATION

       This is an action brought under Sections 205(g) and 1631(c)(3) of the Social Security

Act, 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final

decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Polly

Kunselman's claims for a period of disability and disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.

The matter has been referred to the undersigned United States Magistrate Judge to prepare a

report and recommendation pursuant to the provisions of 28 U.S.C. § 636(b) and Rule 72(b)

of the Federal Rules of Civil Procedure. For the reasons expressed herein, and upon detailed

consideration of the arguments raised by the parties in their respective briefs, it is

respectfully recommended that the Commissioner's decision be  vacated and that the case be

remanded to the Commissioner to conduct a new administrative hearing pursuant to

sentence four of 42 U.S.C. § 405(g).

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Acting Commissioner Nancy A. Berryhill is automatically substituted as the named defendant in place of former Acting Commissioner Carolyn W. Colvin.

## I. BACKGROUND & PROCEDURAL HISTORY

On April 17, 2012, when she was 45 years old, Kunselman protectively filed applications for benefits under Titles II and XVI of the Social Security Act asserting an onset date of that same day. (Doc. 1, ¶ 5; Doc. 9-2, at 19; Doc. 9-3, at 7-8). Kunselman alleged that she became disabled due to the following impairments: chronic fatigue, chronic back pain, diabetes, anxiety, depression, and a gland tumor. (Doc. 9-3, at 7).

On August 20, 2012, Kunselman's claims were denied at the initial level of administrative review. (Doc. 9-3, at 19, 33; Doc. 9-4, at 2-11). During the initial evaluation of Kunselman's claims, it was determined that the available evidence established the existence of the following medically determinable severe impairments: discogenic and degenerative back disorders ("DDD"), obesity, and affective disorders. (Doc. 9-3, at 13, 26). Her claim was denied after an adjudicator determined that Kunselman was capable of performing her past relevant work. (Doc. 9-3, at 18-19, 32-33). Kunselman filed a timely request for a hearing before an administrative law judge ("ALJ") on October 19, 2012. (Doc. 9-4, at 12-13).

Kunselman appeared and testified at administrative hearings before ALJ Randy Riley on February 11 and June 24, 2014, (Doc. 9-2, at 19, 37-89). Impartial vocational expert ("VE") Paul A. Anderson also appeared and testified at the second hearing.[2] (Doc. 9-2, at 19). Kunselman was represented by counsel at both ALJ hearings. (Doc. 9-2, at 19, 37, 56). The ALJ denied Kunselman's claims in a written decision dated July 3, 2014, in which the ALJ concluded that Kunselman was capable of adjusting to a limited range of sedentary

---

[2] VE Brian Bierley attended the first hearing but did not testify. (Doc. 9-2, at 19, 87).

work for which there exists a significant number of jobs in the national economy. (Doc. 9-2, at 30-32). On September 5, 2014, Kunselman requested review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review. (Doc. 9-2, at 14-15). The Appeals Council denied her request for review on March 9, 2016, thus affirming the ALJ's July of 2014 decision as the final decision of the Commissioner subject to judicial review by this Court. (Doc. 9-2, at 2-7).

Kunselman initiated this action by filing a complaint, through counsel, on May 3, 2016. (Doc. 1). In her complaint, Kunselman alleges that the ALJ's decision was "erroneous and contrary to settled law." (Doc. 1, ¶ 15). As relief she requests that this Court reverse the ALJ's decision and award benefits, or in the alternative, remand this case for a new administrative hearing. (Doc. 1, at 4). After service of the complaint, the Commissioner filed an answer together with a certified transcript of the entire record of the administrative proceedings on July 5, 2016. (Doc. 8; Doc. 9). In her answer, the Commissioner asserts that the ALJ's findings of fact are supported by substantial evidence and that the decision was made in accordance with the law and regulations. (Doc. 8, ¶11). This matter has been fully briefed by the parties and is now ripe for decision. (Doc. 14; Doc. 15; Doc. 20).

## II. STANDARD OF REVIEW

In order to receive benefits under Title II or Title XVI of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To satisfy this

requirement, a claimant must have a severe physical or mental impairment[3] that makes it impossible to do his or her previous work or any other substantial gainful activity[4] that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). Additionally, to be eligible to receive benefits under Title II of the Social Security Act, a claimant must be insured for disability insurance benefits. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131.

In evaluating whether a claimant is disabled as defined in the Social Security Act, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment;[5] (4) whether the claimant is able to do past relevant work, considering his or her residual functional capacity ("RFC");[6] and (5) whether the claimant is able to do any

---

[3] A "physical or mental impairment" is defined as an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

[4] "Substantial gainful activity" is defined as "work that—(a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

[5] An extensive list of impairments that warrant a finding of disability based solely on medical criteria, without considering vocational criteria, is set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1.

[6] A claimant's RFC is the most a claimant can still do despite the physical and mental limitations of his or her impairment(s) and any related symptoms (e.g., pain). 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This assessment encompasses all of the claimant's medically-determinable impairments, including those that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The ALJ assesses the claimant's RFC before proceeding from step three to step four in the sequential evaluation process. 20 C.F.R.
*(footnote continued on next page)*

other work that exists in significant numbers in the national economy, considering his or her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 20 C.F.R. § 404.1512(a) (effective June 12, 2014, through Apr. 19, 2015); 20 C.F.R. § 416.912(a) (effective June 12, 2014, through Apr. 19, 2015).[7] Once the claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f) (effective June 12, 2014, through Apr. 19, 2015); 20 C.F.R. § 416.912(f) (effective June 12, 2014, through Apr. 19, 2015).

In reviewing the Commissioner's final decision denying a claimant's application for benefits, the Court's review is limited to determining whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g) by reference); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

---

§§ 404.1520(a)(4), 416.920(a)(4). The RFC is then used at steps four and five to evaluate the claimant's case. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[7] The versions of 20 C.F.R. § 404.1512 and 20 C.F.R. § 416.912 in effect at the time the ALJ issued his decision in this case have been amended during the pendency of this action. Section (a) of these regulations remains virtually unchanged. *See* 20 C.F.R. § 404.1512(a) (effective Mar. 27, 2017); 20 C.F.R. § 416.912(a) (effective Mar. 27, 2017). However, section F has been redesignated as section (b)(3). *See* 20 C.F.R. § 404.1512(b)(3) (effective Mar. 27, 2017); 20 C.F.R. § 416.912(b)(3) (effective Mar. 27, 2017). In this opinion, the Court cites to the regulations relied on by the ALJ when he evaluated Kunselman's claim. In any event, the application of the new version of these provisions would not affect the analysis of this case.

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988) (internal quotations omitted). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales,* 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, however, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n,* 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart,* 304 F.Supp.2d 623, 627 (M.D. Pa. 2003). The question before the Court, therefore, is not whether Kunselman is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin,* No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence."); *Burton v. Schweiker,* 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan,* 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca,* 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues decided by the Commissioner.").

### III. THE ALJ'S DECISION

In his July 2014 decision denying Kunselman's applications for benefits, the ALJ assessed Kunselman's case at each step of the five-step sequential evaluation process before concluding that Kunselman was "not disabled" because she could adjust to other work that exists in the national economy. (Doc. 9-2, at 19-32). As a preliminary matter, the ALJ found that Kunselman met the insured status requirement of Title II of the Social Security Act through December 31, 2015. (Doc. 9-2, at 19, 21). Thus, in order to prevail on her Title II claim, Kunselman must show that she became disabled on or before that date. (Doc. 9-2, at 19).

Proceeding to step one of the sequential evaluation process, the ALJ found that Kunselman had not engaged in substantial gainful activity since the April 17, 2012 onset date. (Doc. 9-2, at 21).

At step two, the ALJ found that the medical evidence of record established the presence of the following medically determinable severe impairments during the relevant period: DDD of the cervical and lumbar spine, hypertension, hypothyroidism, obesity, affective disorders, attention deficit disorder, posttraumatic stress disorder, and decreased visual acuity in the right eye. (Doc. 9-2, at 21-23).

At step three, the ALJ found that during the relevant period, Kunselman did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in the version of 20 C.F.R. Part 404, Subpart P, Appendix 1 that was in effect on the date the ALJ issued his decision. (Doc. 9-2, at 23-24). First, the ALJ determined that Kunselman's degenerative disc disease did not meet listing 1.04. (Doc. 9-2, at 23). Second, the ALJ found that Kunselman's obesity did not increase the severity of

any of her coexisting impairments to the point were the combination of impairments met any listed impairment. (Doc. 9-2, at 23). Third, the ALJ then evaluated Kunselman's hypertension and hypothyroidism under the listings for "other affected body systems" and concluded that neither impairment met a listing. (Doc. 9-2, at 23). Fourth, the ALJ considered Kunselman's visual impairment under listings 2.02, 2.03, and 2.04, but found that none of the listings were satisfied because Kunselman's better eye visual acuity, visual field, and visual efficiency were not significantly limited. (Doc. 9-2, at 23). Fifth and finally, the ALJ concluded that the severity of Simcox's mental impairments, considered in combination, did not meet listings 12.04 or 12.06. (Doc. 9-2, at 23-24).

Between steps three and four, the ALJ assessed Kunselman's RFC. (Doc. 9-2, at 24-30). Kunselman alleged that her impairments caused symptoms of fatigue, sleep disturbance, hip pain, leg pain, neck pain, and back pain, and also impacted her ability to sleep, lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, and get along with others. (Doc. 9-2, at 25). After examining her statements and the medical evidence, the ALJ found that Kunselman's impairments could reasonably be expected to cause the alleged symptoms, but that Kunselman's statements about the intensity, persistence, and the limiting effects of the symptoms were not entirely credible. (Doc. 9-2, at 26). The ALJ then went on to detail Kunselman's medical record and treatment history, including mental health therapy. (Doc. 9-2, at 26-30). In doing so, the ALJ considered and weighed medical opinions by the following sources: treating physician Mary Jo Szada ("Dr. Szada"), treating physician James Sioma ("Dr. Sioma"), nontreating physical consultative examiner Thomas McLaughlin ("Dr. McLaughlin"), nontreating psychiatric consultative examiner Christopher Royer ("Dr. Royer"), and nonexamining

state agency psychologist Richard W. Williams ("Dr. Williams"). (Doc. 9-2, at 28-29; Doc. 9-3, at 15-17, 29-31; Doc. 9-9, at 11-30, 77-80; Doc. 9-13, at 52-56). Finally, the ALJ also considered Kunselman's global assessment of functioning ("GAF") scores and a third-party statement from Pauline Gutshall, Kunselman's mother. (Doc. 9-2, at 29; Doc. 9-6, at 13-20; Doc. 9-9, at 26, 38).

Dr. Szada examined Kunselman on approximately ten occasions between September of 2013 and April of 2014. (Doc. 9-14, at 3-22). Additionally, in February of 2014, Dr. Szada completed a check-the-box functional capacity form in which she opined on Kunselman's limitations. (Doc. 9-13, at 53-56). The ALJ concluded that because Dr. Szada only treated Kunselman infrequently, her opinions were not a reliable indicator of Kunselman's longitudinal functioning. (Doc. 9-2, at 28). Accordingly, the ALJ afforded Dr. Szada's opinion only limited weight. (Doc. 9-2, at 28).

The ALJ also addressed the opinion of Dr. Sioma, another treating physician. (Doc. 9-2, at 28). In July of 2013, Dr. Sioma completed a check-the-box report in which he opined on Kunselman's physical limitations in performing work-related activities. (Doc. 9-9, at 77-80). The ALJ noted that Dr. Sioma based his opinions solely on Kunselman's own reports, as opposed to specific clinical findings. (Doc. 9-2, at 28; Doc. 9-9, at 79). Furthermore, the ALJ determined that Dr. Sioma's opinions were inconsistent with the relatively modest findings in a CT scan completed around that same time. (Doc. 9-2, at 28 (citing Doc. 9-12, at 59)). Accordingly, the ALJ afforded Dr. Sioma's opinion very little weight. (Doc. 9-2, at 28).

In addition to the two treating physicians, the ALJ also took into account the opinions of two nontreating consultative examiners, Dr. McLaughlin and Dr. Royer. (Doc.

9-2, at 28-29). Dr. McLaughlin evaluated Kunselman on July 12, 2012 and produced a report detailing his findings and opinions on July 18, 2012. (Doc. 9-9, at 11-19). In his report, Dr. McLaughlin opined that Kunselman could lift or carry up to ten pounds occasionally, stand or walk for four hours, and sit for eight hours if given the ability to sit or stand at her option, while also noting that Kunselman had additional postural, environmental, and visual limitations. (Doc. 9-2, at 28; Doc. 9-9, at 18-19). The ALJ found that Dr. McLaughlin's opinions were supported by clinical evidence and appropriately considered Kunselman's own allegations. (Doc. 9-2, at 28). For instance, the ALJ noted that although Kunselman complained of increased pain with prolonged sitting, standing, and walking, as well as difficulty performing tasks with her lower extremities like squatting and standing on one leg, the pain was not so debilitating so as to prevent Kunselman from performing a range of sedentary work with appropriate postural limitations. (Doc. 9-2, at 28). Accordingly, the ALJ afforded Dr. McLaughlin's opinion significant weight. (Doc. 9-2, at 28).

Dr. Royer, a psychiatric consultative examiner, evaluated Kunselman on August 2, 2012 and produced a report detailing his findings and opinions two weeks later. (Doc. 9-9, at 23-29). In his report, Dr. Royer opined that Kunselman had slight limitations in understanding, remembering and carrying out simple, short instructions; moderate limitations understanding, remembering and carrying out detailed instructions, interacting appropriately with supervisors, and responding appropriately to work pressures; and marked limitations making judgments on simple work-related decisions, interacting appropriately with the public and coworkers, and responding appropriately to changes in routine work settings. (Doc. 9-9, at 28). The ALJ found that Dr. Royer's opinion was internally

inconsistent and based on subjective findings. (Doc. 9-2, at 29). For instance, the ALJ found it inconsistent that Kunselman could simultaneously have only a slight limitation in understanding, remembering and carrying out simple, short instructions while also having a marked limitation in the ability to make judgments on simple work-related decisions. (Doc. 9-2, at 29 (citing Doc. 9-9, at 28)). Similarly, the ALJ found Dr. Royer's opinion that Kunselman had a marked limitation in social functioning to be inconsistent with the medical evidence that showed a lack of hospitalizations, ongoing intensive counseling, or persistent social deficits noted on clinical examination. (Doc. 9-2, at 29 (citing Doc. 9-9, at 28)). Although the ALJ conceded that Kunselman showed signs of anxiousness and social withdrawal that were noted in the record, he considered these signs not to be severe enough to warrant Dr. Royer's finding that Kunselman had a marked limitation in social functioning. (Doc. 9-2, at 29 (citing Doc. 9-9, at 28)). Accordingly, the ALJ afforded Dr. Royer's opinion little weight. (Doc. 9-2, at 29).

As a final matter, the ALJ also considered the opinion of Dr. Williams, a nonexamining state agency psychological consultant. (Doc. 9-2, at 28-29). Dr. Williams proffered an opinion on August 20, 2012, in which he assessed Kunselman as mentally capable of the following: remembering locations and work-like procedures; understanding, remembering, and carrying out short and simple instructions; performing activities within a schedule, maintaining regular attendance and being punctual; sustaining an ordinary routine without special supervision; making simple work-related decisions; completing a normal workday and workweek without interruptions from her symptoms or requiring an unreasonable amount of rest; asking simple questions and requesting assistance; getting along with coworkers or peers; maintaining socially appropriate behavior; protecting herself

from normal hazards; travelling in unfamiliar places; and setting realistic goals or making independent plans. (Doc. 9-3, at 15-16, 29-30). However, Dr. Williams also found Kunselman to have moderate limitations in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working with or near others without being distracted; interacting appropriately with the public; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting. (Doc. 9-3, at 15-16, 29-30). Despite these limitations, Dr. Williams found that the severity of Kunselman's mental impairment did not preclude her from performing simple, routine work. (Doc. 9-3, at 17, 31). The ALJ found Dr. Williams's opinion to be worthy of great weight because it was "consistent with the level of treatment received and ongoing medical evidence," and noted that Dr. Williams appropriately balanced Kunselman's history of emotional lability, anxiousness, and social withdrawal with her intact memory, fair insight and judgment, and appropriate thought process/content on clinical evaluation. (Doc. 9-2, at 28-29).

Based on his consideration of the above medical opinions and of the other relevant evidence of record, the ALJ assessed that, during the relevant period, Kunselman had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with the following additional exertional and nonexertional limitations:

> sit/stand option at will; can occasionally bend; no climbing ladders, balancing, stooping, kneeling or crouching; must avoid concentrated exposure to cold, heat and irritants; limited to occupations not requiring right peripheral acuity; work is limited to simple, routine, repetitive tasks in a work environment free from fast-paced production involving only simple work-related decisions with few, if any, workplace changes; no interaction with the public; occasional interaction with coworkers but no tandem tasks; and occasional supervision.

(Doc. 9-2, at 24-25).

At step four of the sequential evaluation process, the ALJ found that Kunselman was unable to perform any past relevant work. (Doc. 9-2, at 30). Kunselman's past relevant work included: home attendant; machine operator II, any industry; school bus driver; truck driver; warehouse worker; and flagger, construction. (Doc. 9-2, at 30). The ALJ explained that the demands of each of these jobs exceeded Kunselman's current RFC in that the jobs were all performed at either light, medium, or heavy exertional levels whereas Kunselman's current RFC restricts her to a limited range of sedentary work. (Doc. 9-2, at 30). Furthermore, the ALJ noted that his findings were consistent with VE Anderson's testimony that—based on the ALJ's assessment of Kunselman's current RFC—Kunselman could not perform her past relevant work. (Doc. 9-2, at 30, 47-49).

At step five, the ALJ considered Kunselman's RFC, age (younger individual age 45-49), education (limited—some high school), and work experience to ultimately conclude that jobs existed in significant numbers in the national economy that Kunselman could perform. (Doc. 9-2, at 30-31). The ALJ based his assessment on testimony by VE Anderson. (Doc. 9-2, at 31). In response to a hypothetical question that mirrors the RFC above, VE Anderson testified that an individual of the same age, education, work experience, and RFC as Kunselman could adjust to work in representative occupations such as bonder, semi conductor (DOT #726.685-066), and nut sorter (DOT #521.687-086). (Doc. 9-2, at 31, 49). VE Anderson also testified that there are approximately 30,000 jobs in the national economy as a bonder, semi conductor and approximately 16,200 jobs in the national economy as a nut sorter. (Doc. 9-2, at 31, 49). Accordingly, the ALJ concluded that Kunselman was not disabled because she could adjust to other work that exists in significant

numbers in the national economy despite the limiting effects of her impairments. (Doc. 9-2, at 31).

## IV. ANALYSIS

Kunselman alleges two errors in arguing that the ALJ's decision denying her applications for benefits is not supported by substantial evidence: (1) that the ALJ did not properly evaluate all medically-determinable impairments that were established in the record, and (2) that the ALJ did not properly evaluate the medical opinion evidence in the record. (Doc. 14, at 9). As relief, Kunselman seeks reversal of the ALJ's decision or alternatively, a remand for a new administrative hearing. (Doc. 1, at 4-5; Doc. 14, at 14).

### A. THE ALJ'S EVALUATION OF KUNSELMAN'S MEDICALLY DETERMINABLE IMPAIRMENTS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Kunselman first argues that the ALJ erred by failing to properly evaluate all medically-determinable impairments established in the record. (Doc. 14, at 10-11). Specifically, Kunselman alleges that the ALJ did not properly consider the severity of her cardiac condition, despite the ALJ's acknowledgment that Kunselman required surgery to implant a pace maker in April of 2013. (Doc. 14, at 10-11). While the Commissioner concedes that "the ALJ did not cite [Kunselman's] cardiac condition in his step two and step three findings," she nonetheless maintains that the ALJ sufficiently addressed the cardiac condition when considering the decision "read as a whole." (Doc. 15, at 10).

The Social Security regulations provide that an ALJ will evaluate whether a claimant has any medically-determinable impairments. *See* 20 C.F.R. §§ 404.1529(b) (effective June 13, 2011 through Mar. 26, 2017), 416.929(b) (effective June 13, 2011 through Mar. 26, 2017) ("[The ALJ] will develop evidence regarding the possibility of a medically determinable mental impairment when . . . information . . . suggest[s] that such an

impairment exists . . . .”). The determination of whether a claimant has any severe impairments at step two of the sequential evaluation process is a threshold test. 20 C.F.R. §§ 404.1520(c), 416.920(c). “If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.” *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). “An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have no more than a minimal effect on an individual's ability to work.” *Newell*, 347 F.3d at 546 (quotations omitted). In calculating a claimant’s RFC between steps three and four, however, the ALJ is required to consider *all* medically determinable impairments—both severe and non-severe. *See Kich v. Colvin*, 218 F. Supp. 3d 342, 355 (M.D. Pa. 2016); 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

The Commissioner first argues that the ALJ’s failure to consider Kunselman’s cardiac condition at step two was harmless error. (Doc. 15, at 7-8). An ALJ’s failure to identify a medically-determinable impairment as severe does not automatically constitute reversible error at step two if the ALJ found some other impairment to be severe and thus permitted the sequential evaluation process to continue. *See, e.g., Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 262 (3d Cir. 2006) (not precedential) (“[Claimant] also argues that the ALJ committed errors in the second step, but the ALJ found in her favor at that step (holding that she did have a severe impairment), so any such errors were harmless.”). Here, the ALJ identified several other severe impairments, namely: DDD of the cervical and lumbar spine, hypertension, hypothyroidism, obesity, affective disorders, attention deficit disorder, posttraumatic stress disorder, and decreased visual acuity in the right eye. (Doc. 9-2, at 21). Accordingly, the failure to consider Kunselman’s cardiac condition at step two

was harmless error because the ALJ found that Kunselman suffered from other severe impairments and proceeded with the sequential evaluation process.[8]

The Commissioner further argues that the ALJ appropriately considered Kunselman's cardiac condition when assessing her RFC between steps three and four. (Doc. 15, at 5). In making the RFC determination, "the ALJ must consider all evidence before him." *Burnett,* 220 F.3d at 121 (citations omitted). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett,* 220 F.3d at 121. Here, the ALJ discussed the evidence of Kunselman's cardiac condition as follows:

> At the consultative examination in mid-2012, the claimant denied exertional chest pains, dyspnea on exertion, nocturnal dyspnea, orthopnea, pitting edema, palpitations, productive cough and hemoptysis. On examination, no chest wall lesions or tenderness to palpation was noted. There was no use of accessory muscles of respiration, increased AP diameter, wheezes, rales, prolonged expiratory phase or rhonchi. The breath sounds were symmetrical bilaterally, and she had symmetrical excursion. Dizziness and chest pain were noted in early 2013 secondary to second-degree AV block on telemetry, but it appears these symptoms are generally controlled after a successful dual chamber pacemaker implantation. A chest x-ray in April 2013 showed probable lingular atelectasis, and no pneumothorax was noted status post pacer implant. It was noted at this time that the claimant had a prior cardiac catheterization that demonstrated no evidence of significant coronary disease and preserved left ventricular function. The claimant reported tachycardia and weight gain in June 2013 but had normal cardiac examination in May and

---

[8] To the extent that Kunselman also contends that the ALJ's failure to consider the severity of her cardiac condition potentially impacted step three of the sequential evaluation process, her argument fails because Kunselman does not allege that her impairments met a listing. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (not precedential) ("[Claimant] also complains in vague terms that certain impairments were not properly compared, separately and in combination, to the listings. But he does not identify specific avenues for meeting or equaling specific listings that the ALJ should have considered but did not."); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 n.2 (3d Cir. 2000) ("[T]he burden is on the claimant to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment . . . .").

June 2013. From a longitudinal standpoint, the claimant's cardiac symptoms are only intermittent in nature. These symptoms include dyspnea on exertion, chest pain and lightheadedness but do not include syncopal episodes. Although some fatigue is noted in the record, records do not establish that her fatigue is of the persistence or severity as alleged. For example, in September 2012, it was noted that the claimant was well rested and upbeat. Moreover, the claimant generally only requires routine medical visits and medications. No chest abnormalities were noted via CTA in August 2013.

(Doc. 9-2, at 27 (citations omitted)).

Contrary to Kunselman's contentions, the ALJ's assessment of the severity of Kunselman's cardiac condition did not rest solely on progress notes from a September 2012 treatment stating that she was well rested and upbeat. (Doc. 14, at 10-11 (citing (Doc. 9-2, at 27)). Indeed, the ALJ appears to have mentioned and explained all of the medical evidence before him that pertained to Kunselman's cardiac condition. *Compare* (Doc. 20, at 1-2 (describing evidence of Kunselman's cardiac condition)), *with* (Doc. 9-2, at 27 (discussing that same evidence in assessing Kunselman's RFC)). The Court thus finds that the ALJ's analysis of Kunselman's cardiac condition while formulating the RFC assessment was not erroneous.

Accordingly, substantial evidence supports the ALJ's evaluation of Kunselman's medically-determinable impairments.

B. The ALJ's evaluation of medical opinion evidence is not supported by substantial evidence

Kunselman next alleges that the ALJ erred by inappropriately weighing the medical opinion evidence. (Doc. 14, at 11-14). In particular, Kunselman contends that the ALJ "cherry picked" GAF scores, overlooked the opinion of treating psychiatrist J. Scott Trayer ("Dr. Trayer"), improperly rejected Dr. Szada's opinion, and failed to give weight to the consistency of the opinions from Ms. Kunselamn's treating sources. (Doc. 14, at 11-14).

### 1. The ALJ impermissibly "cherry picked" GAF scores

Kunselman argues that the ALJ considered her assessed GAF scores of 60 from 2010 in formulating the RFC assessment while impermissibly ignoring a more recent GAF score of 45. (Doc. 14, at 11-12). In her brief, the Commissioner attempts to downplay the significance of the ALJ's omission by arguing that GAF scores are outdated and unreliable. (Doc. 15, at 16-18). GAF scores "are used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults." *Irizarry v. Barnhart*, 233 F. App'x 189, 190 n.1 (3d Cir. 2007) (not precedential). "The GAF scale, designed by the American Psychiatric Association, ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest." *Rivera v. Astrue*, 9 F. Supp. 3d 495, 496 n.1 (E.D. Pa. 2014). "A GAF score of 50 or below indicates serious symptoms, while a GAF score of 51 through 60 indicates moderate symptoms." *Rivera*, 9 F. Supp. 3d at 504 (citing *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV)* 32, 34 (4th ed. 2000)). "Although a claimant's GAF score does not have a 'direct correlation to the severity requirements,' the GAF score remains the scale used by mental health professionals to 'assess current treatment needs and provide a prognosis.'" *Rivera*, 9 F. Supp. 3d at 504 (quoting *Colon v. Barnhart*, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006)). While "the Third Circuit has yet to address in a precedential opinion whether an ALJ's failure to discuss numerous GAF scores requires remand[,] . . . [t]he district courts in the Third Circuit have repeatedly held that the ALJ's failure to specifically discuss a GAF score that supports serious impairments in social or occupational functioning is cause for remand." *Rivera*, 9 F. Supp. 3d at 504-05 (collecting cases).

Here, the ALJ's decision to address and afford some weight to Kunselman's scores of 60 assessed in 2010 undermines the Commissioner's argument that GAF scores are *per se* unreliable. (Doc. 9-2, at 29 (citing Doc. 9-9, at 37-55)). The ALJ also considered but gave only limited weight to a GAF score of 48 assessed by Dr. Royer during his examination in August of 2012, in part because the ALJ found that this GAF score was "inconsistent with the scores in the treatment records." (Doc. 9-2, at 29 (citing Doc. 9-9, at 23)). However, the ALJ did not mention the GAF score of 45 assessed by Dr. Trayer and clinician Kim Cuff in January of 2013. (Doc. 9-9, at 73; Doc. 14, at 11). An "ALJ may not 'cherry-pick' higher GAF scores in his analysis and ignore GAF scores that may support a disability." *Rivera, 9 F. Supp. 3d at 505*. Here, the score assessed by Dr. Trayer and Ms. Cuff "indicate[d] serious symptoms," and accordingly warranted discussion in the ALJ's decision. *See Rivera, 9 F. Supp. 3d at 504-05*. Because the ALJ failed to address the score of 45 assessed by Dr. Trayer and Ms. Cuff, the Court is unable to determine whether this low GAF score was discredited or simply ignored. *See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)* ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). The Court finds that the ALJ's evaluation of the opinion evidence is not supported by substantial evidence because the ALJ failed to address all relevant opinion evidence, including the RFC score of 45 assessed by Dr. Trayer and Ms. Cuff.[9] Although the ALJ may ultimately reach the same conclusions in determining Kunselman's RFC, he may do so only after considering all of the evidence, including

---

[9] Furthermore, the existence of the GAF score of 45 at least partially undermines the ALJ's rationale for discrediting the GAF score of 48 assessed by Dr. Royer.

Kunselman's lowest and most recent GAF score. Accordingly, it is respectfully recommended that the Commissioner's decision be vacated and that the case be remanded.

### 2. The ALJ erred by failing to address Dr. Trayer's opinion

In addition to the GAF assessment, Kunselman also appears to allege that the ALJ failed to discuss Dr. Trayer's treatment and opinions altogether. (Doc. 14, at 12-13). The medical record reveals that Dr. Trayer treated Kunselman sporadically between 2010 and 2013. (Doc. 9-7, at 32-34; Doc. 9-9, at 37-39, 71-76). The record contains progress notes from these visits as well as a statement after a visit in January of 2013 in which Dr. Trayer opines that Kunselman is mentally and physically unable to do work. (Doc. 9-9, at 37-39, 71-76). Although the ALJ referred to these progress notes occasionally in his RFC assessment when referring to Kunselman's symptoms and presentation, the ALJ did not list Dr. Trayer among the sources of opinion evidence that he considered. (Doc. 9-2, at 25-30).

It is well-settled law that an ALJ has the authority to evaluate and weigh medical opinions. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). However, the federal regulations are equally clear that an ALJ "will evaluate every medical opinion . . . receive[d]." 20 C.F.R. §§ 404.1527(c), 416.927(c). Indeed, "[t]he Secretary must 'explicitly' weigh all relevant, probative and available evidence. . . . The Secretary may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *see also Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000) ("[T]he ALJ must review all of the pertinent medical evidence, explaining his conciliations and rejections."). Social Security Ruling ("SSR") 96-5p further clarifies that "opinions from any medical source on issues reserved to the Commissioner must never be ignored," and

specifically states that the ALJ's "decision must explain the consideration given to the treating source's opinion(s)."[10] SSR 96-5p, 1996 WL 374183, at *3, *6 (July 2, 1996).

The ALJ's failure to acknowledge treating psychiatrist Dr. Trayer's opinion leaves the Court unable to conclude that the ALJ's assessment of the medical opinion evidence was supported by substantial evidence. Accordingly, it is respectfully recommended that the Commissioner's decision be vacated and that the case be remanded.

### 3. The ALJ erred in evaluating the opinion of treating physician Dr. Szada

Kunselman next argues that the ALJ erred by affording Dr. Szada's opinion only limited weight based solely on the length of Dr. Szada's treatment relationship with Kunselman. (Doc. 9-2, at 28; Doc. 14, at 13). Although an ALJ is authorized to evaluate and weigh medical opinions, as noted above, "the ALJ must consider all the evidence and give some reason for discounting the evidence [he or] she rejects." *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999) (internal quotations omitted). In particular, an ALJ generally "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Simmonds v. Astrue*, 872 F. Supp. 2d 351, 359 (D. Del. 2012); *see also* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) (noting that ALJs generally must "give more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]"). A treating source's opinion may be rejected "only on the basis of

---

[10] SSRs are agency rulings published under the authority of the Commissioner and are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1). SSRs do not have the force and effect of the law or regulations but are to be "relied upon as precedents in determining other cases where the facts are basically the same." *Heckler v. Edwards*, 465 U.S. 870, 873, n.3 (1984).

contradictory medical evidence, but may [be] afford[ed] . . . more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429. However, a treating source's opinion may not be rejected "for no reason or for the wrong reasons." *Plummer*, 186 F.3d at 429.

Here, Kunselman and the Commissioner appear to agree that Dr. Szada was a treating source, even though her treatment relationship with Kunselman only lasted for approximately seven months.[11] (Doc. 14, at 13; Doc. 15, at 14). SSR 96-6p addresses the weight afforded to treating medical sources.[12] SSR 96-6p, 1996 WL 374180 (July 2, 1996). SSR 96-6p notes that "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Under certain circumstances, the medical opinion of a treating source may be entitled to controlling weight. *See* 20 C.F.R. §§

---

[11] A "treating source" is defined as a claimant's "own physician, psychologist, or other acceptable medical source who provides . . . medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502 (effective June 13, 2011 through Mar. 26, 2017), 416.902 (effective June 13, 2011 through Mar. 26, 2017). An "ongoing treatment relationship" exists or existed if the claimant "see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." 20 C.F.R. §§ 404.1502 (effective June 13, 2011 through Mar. 26, 2017), 416.902 (effective June 13, 2011 through Mar. 26, 2017). In the case at bar, the Commissioner does not contend that the length of Dr. Szada's treatment relationship with Kunselman was too short to be consistent with accepted medical practice. *See* 20 C.F.R. §§ 404.1502 (effective June 13, 2011 through Mar. 26, 2017), 416.902 (effective June 13, 2011 through Mar. 26, 2017) ("We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).").

[12] SSR 96-6p was published and became effective on July 2, 1996. Although since rescinded and replaced by SSR 17-2p, SSR 96-6p was in effect at the time the ALJ rendered his decision in this matter.

404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996). A treating physician's opinion warrants controlling weight where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Even if a treating source's medical opinion is not entitled to controlling weight, it still may be entitled to significant deference. *See* SSR 96-2p, 1996 WL 374188. Upon establishing that a treating source's opinion is not entitled to controlling weight, an ALJ must weigh the opinion "using all of the factors provided in 20 CFR 404.1527 and 416.927." SSR 96-2p, 1996 WL 374188. These factors include: (1) the examining relationship; (2) the treatment relationship, including its length and nature; (3) the supportability of the medical source's opinions; (4) consistency; (5) specialization; and (6) other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c).

In his decision, the ALJ erred by only considering the length of the treatment relationship between Dr. Szada and Kunselman, one of the six factors set out in 20 C.F.R. §§ 404.1527 and 416.927, without first determining whether Dr. Szada's opinion should have been entitled to controlling weight. (Doc. 9-2, at 28); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Indeed, the ALJ's decision failed to consider whether Dr. Szada's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Because the ALJ did not first determine whether Dr. Szada's opinion was entitled to controlling weight, he rejected Dr. Szada's opinion "for the wrong reasons" by prematurely relying on one of the six factors provided in 20 C.F.R. §§ 404.1527 and 416.927. *See Plummer*, 186 F.3d at 429. *See generally Simmonds v. Astrue*, 872 F.

Supp. 2d 351, 359 (D. Del. 2012) ("[T]he ALJ must carefully evaluate how much weight to give the treating physician's opinion and provide an explanation as to why the opinion is not given controlling weight."). Furthermore, the ALJ's decision to reject Dr. Szada's opinion purely on the basis of the length of her treatment relationship with Kunselman is also logically inconsistent with his decision to afford the opinions of Dr. McLaughlin and Dr. Williams "significant" and "great" weight, respectively, even though Dr. McLaughlin only examined Kunselman once and Dr. Williams never examined her at all. (Doc. 9-2, at 28-29; Doc. 9-3, at 15-17, 29-31; Doc. 9-9, at 11-19). Because the ALJ did not point to any medical evidence to contradict Dr. Szada's opinion or even show how the opinion lacked evidentiary support, his finding that Dr. Szada's opinion was entitled to only limited weight is not supported by substantial evidence.[13] This Court therefore respectfully recommends that the Commissioner's decision be vacated and that the case be remanded.

### 4. Cumulative effect of consistent opinions from examining sources

Kunselman further alleges that the ALJ failed to account for the consistency of opinions from multiple treating sources and a consultative examiner, as the ALJ rejected their opinions in favor of the opinions from a nonexamining state agency psychologist (Dr. Williams) and a one-time examiner (Dr. McLaughlin). (Doc. 14, at 14). Specifically, Kunselman noted that Dr. Trayer, Dr. Szada, and Dr. Sioma each found that Kunselman was more limited than the ALJ ultimately concluded. (Doc. 9-2, at 28; Doc. 9-7, at 32-34;

---

[13] In her brief, the Commissioner attempts to provide an *ex post facto* basis to reject Dr. Szada's opinion. (Doc. 15, at 14-16). However, it is the role of this Court to review the reasoning that the ALJ actually provided, rather than engage in its own independent analysis. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *Fargnoli v. Massanari,* 247 F.3d 34, 44 (3d Cir. 2001).

Doc. 9-9, at 37-39, 71-80; Doc. 9-13, at 53-56; Doc. 9-14, at 3-22). The Third Circuit has noted that:

> [a] single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

> *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

On the other hand, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). Because the Court has already found that the ALJ erred in his evaluation, or lack thereof, of the opinions provided by Dr. Trayer and Dr. Szada, the Court declines to consider the ultimate issue of whether the opinions provided by Dr. Williams and Dr. McLaughlin were "overwhelmed" by the three opinions offered by treating sources. See *Burns v. Colvin*, 156 F. Supp. 3d 579, 598 (M.D. Pa. 2016) ("A remand may produce different results on these claims, making discussion of them moot."). However, this Court generally reiterates that contradictory medical evidence is needed in order to reject a treating source's opinion and that "consistency" is one of several factors to be evaluated under 20 C.F.R. §§ 404.1527 and 416.927. *See Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999).

### C. REMEDY

The Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the case for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100-01 (1991). However, the Third Circuit has advised that benefits

should only be awarded where "the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). *See generally Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). Because the Court concludes that it is necessary to further develop the record in the case at bar, the undersigned United States Magistrate Judge respectfully recommends that the decision of the Commissioner be vacated and that the case be remanded for further proceedings.

## V.  RECOMMENDATION

Based on the foregoing, it is recommended that the Commissioner's decision be **VACATED**, and that the case be **REMANDED** to the Commissioner to fully develop the record, conduct a new administrative hearing, and appropriately evaluate the evidence pursuant to sentence four of 42 U.S.C. § 405(g). It is further recommended that the Clerk of Court be directed to **CLOSE** this case.

Dated: **June 20, 2017**                                       *s/ Karoline Mehalchick*
                                                              **KAROLINE MEHALCHICK**
                                                              **United States Magistrate Judge**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

POLLY A. KUNSELMAN,

          Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,

          Defendant.

CIVIL ACTION NO. 3:16-CV-00747

(MARIANI, J.)
(MEHALCHICK, M.J.)

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **June 20, 2017**. Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**